[Cite as *State v. Gibson*, 2013-Ohio-4372.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98725**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DUANE GIBSON

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-550542

**BEFORE:**  Keough, J., Jones, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:**    October 3, 2013

**ATTORNEY FOR APPELLANT**

Richard Agopian
The Hilliard Building
1415 West 9th Street, 2nd Floor
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By:   John R. Kosko
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Duane Gibson, appeals his convictions and sentence. For the reasons that follow, we affirm.

{¶2} In May 2011, Gibson was charged with one count each of aggravated robbery, felonious assault, and failure to comply, and three counts of kidnapping and murder, in violation of R.C. 2903.02 (felony murder), with the predicate offenses being kidnapping, aggravated robbery, and felonious assault. All of these counts carried one- and three-year firearm specifications. Additionally, Gibson was charged with one count each of having a weapon while under disability, with a forfeiture specification, grand theft, receiving stolen property, theft, and tampering with evidence. The case proceeded to trial where the jury heard the following evidence.

{¶3} At approximately 8:50 a.m. on April 18, 2011, Lloyd Davis ("Davis") was kidnapped at his Kipling Avenue home by three males at gunpoint. Davis's security cameras captured the entire incident. The security video shows three males aggressively approach Davis with guns drawn, forcing him inside his truck, and then driving off in the truck with Davis inside.

{¶4} Davis testified that after he was forced into his truck, his hands were bound behind his back with twine and duct tape, and he was ordered to sit on the floor. According to Davis, he did not recognize any of the males who kidnapped him. Davis stated that the males had their guns pointed at his neck, head, and side, and that the males

were threatening to kill him. He testified that he could see they were following a white Mercury or Ford vehicle that was driving in front of them. As they were driving toward the freeway, one of the males threw Davis's cell phones out of the window. Once they got to the area of East 88th Street and St. Clair Avenue, Davis was blindfolded. While blindfolded, one of the males struck Davis in the head with what felt like a pistol. Davis stated that he was bleeding from his eye after being struck. Also while blindfolded, the males went through his pockets taking his money and jewelry.

{¶5} Eventually the truck came to a stop and Davis remained in the truck. He testified that someone told him that they were not going to kill him, but "dump him" after they got their money. He stated that he did not recognize any of the voices, except one — the voice of Duane Gibson. Davis testified that Gibson told him to "give them your brother's telephone number" and that "I'm not going to hurt you like these guys are going to hurt you." He stated that was the last time he heard Gibson's voice.

{¶6} Davis stated that he was familiar with Gibson's voice because they have common family ties and at one point he considered Gibson family. Additionally, Davis testified that two or three weeks prior to being kidnapped, Gibson approached him warning him that someone was after Davis's brother, Don Davis.

{¶7} Davis testified that on two occasions the kidnappers allowed him to talk to his brother, Don. The first time he told his brother, "they got me," and the second time, he told Don to "give them whatever they want."

{¶8} During the course of the entire day, Davis stated he was struck in the head, burned with cigarettes, and held without food, water, or use of the bathroom. Davis testified that at one point his hands were hurting him so badly, he told his kidnappers to just kill him.

{¶9} Don Davis testified that he was at his Belvoir Boulevard home when he received a call on his cell phone from an unknown caller around 10 a.m. on April 18th. Don did not recognize the caller's voice, but the caller stated that they "had" my brother and that "if you want to see him, you want him back, we're going to need $150,000. If you don't give me the money in twenty minutes, we're going to burn him up, kill him, and burn him up in his truck."

{¶10} Don testified that he did not panic until he found out that Davis was not home, not answering his cell phones, and not at work. Don stated he received a second call about ten minutes later again demanding money and threatening to kill Davis. He then got into his car, drove to a safe location, and called the police.

{¶11} Officer Michael Cox responded to Don's call. After interviewing Don, Officer Cox took Don to the police station to develop a strategy on how to handle the situation. While at the station, Don received a third call, again demanding the money. In an attempt to stall the demands, Don stated that he could not get that kind of money that quickly.

{¶12} Around 12:30 p.m., a plan was devised that uniformed and undercover police officers would accompany Don home and conduct surveillance in and around his

house. Officer Gregory Williams rode with Don back to his house while undercover Officers Robert Taylor and Richard Mauer watched for activity behind Don's house. Officers Robert Sauterer and Smith were parked across the street from Don's house in a unmarked van.

{¶13} After arriving home, Don received about fifteen more phone calls demanding the money. The ransom demand was initially $150,000, but after Don repeatedly told the callers he did not have the money, the ransom amount was reduced to $25,000. Detective Robert Durbin testified that he contacted Don's phone carrier to determine from where the calls were originating. One of the "pings" came from an area around East 152nd Street and Detective Durbin ordered officers to tour that area.

{¶14} After all the officers were in place and a strategy was developed, Don told the kidnappers that he had the money. The caller instructed Don to leave the money on his back patio. Don filled an empty duffle bag with medical supplies and left the bag on his back patio. Law enforcement surrounded the area around Don's house, waiting for the bag to be picked up. Don then received another phone call from the kidnappers stating that they were not coming to the house because of his security cameras.

{¶15} At approximately 5:30 p.m., the kidnappers changed the drop off location and instructed Don to leave his house with the money and drive down Euclid Avenue. Three officers accompanied Don to the new drop location. After driving down Euclid Avenue, he was then instructed to drive to a Walgreens on Dille Road, drive through the

parking lot, and drop the money by the dumpster in the back of the car wash. Don did as instructed and left the scene.

{¶16} The officers conducting surveillance on the bag testified that a male in a red hooded sweatshirt picked up the bag and got into a red Ford Taurus. As the police attempted to detain the vehicle, the driver of the Taurus pulled away and a high speed chase ensued. The Taurus eventually came to a stop after crashing into some railroad ties behind a house in South Euclid. All of the occupants fled from the vehicle, and the pursuing officers chased the suspects on foot.

{¶17} Officer Mitchell Sheehan testified that he was involved in the high speed pursuit of the Taurus. After the vehicle stopped and the vehicle occupants fled, he chased the driver of the vehicle and repeatedly ordered him to stop while identifying himself as a Cleveland police officer. According to Officer Sheehan, the driver ran towards Trebisky Road and, after slipping and falling, Officer Sheehan was able to secure him and place him under arrest. The driver was identified as Duane Gibson.

{¶18} Detective Durbin and Officer Knowles pursued the male in the red hooded sweatshirt. They finally apprehended the male, identified as Jay Hillsman, in the backyard of a house on Trebisky Road.

{¶19} The other occupant of the vehicle, Ron Brunson, was found hiding in some bushes and was apprehended by Officer Renee Perez. According to Officer Perez, Brunson immediately told her and her partner that he had nothing to do with the kidnapping, but that the man that was kidnapped was in a garage. He stated that he did

not know the address, but could help them locate the man. He further told police that he met up with Gibson and Hillsman on East 152nd Street and Shiloh Road and that one of the vehicles they were driving was a white Chevy Malibu.

{¶20} After Gibson, Brunson, and Hillsman were apprehended and secured in the back of police cruisers, Detective Durbin received information that one of the cell phone "pings" had come from a house on Trebisky Road. During the course of interviewing the apprehended males, it was also discovered that Gibson lived at that house. The Trebisky house was searched, but neither the victim nor the victim's truck was located. However, Erica Darby, Gibson's girlfriend, told police that he owned other properties, including residences on Shiloh Road and Herrick Avenue.

{¶21} Based on the interviews with Brunson, the cell phone "pings" they received earlier, and information received from Gibson's girlfriend, Sergeant Andrew Ezzo obtained a few addresses that needed to be investigated because neither the victim nor the victim's truck had been recovered.

{¶22} Officer Mauer testified that hours after the suspects in the Taurus were apprehended, Sergeant Ezzo called him and asked that he and his partner check out two addresses — one on East 112th Street and one on Herrick Avenue. Officers Mauer, Taylor, and Williams then drove in their undercover car to those addresses to investigate.

{¶23} When they arrived at the Herrick Avenue address, they saw a garage behind the house next to the alley. Officer Mauer approached and opened the garage door. He stated that it was relatively dark inside the garage and he could not see very well, but with

the lighting outside, he could see Davis's stolen pick-up truck parked at an angle inside the garage. He testified that he could not see through the back window because the windows were tinted. Officer Mauer stated that he yelled to his partner Officer Taylor that they had found the truck. As Officer Taylor approached the passenger-side door of the truck, he could see people inside. He immediately identified himself as "Cleveland police" and ordered them to "show their hands."

{¶24} According to Officer Mauer, immediately after Officer Taylor announced police presence, the truck engine started up and the reverse lights illuminated. Without hesitation, Officer Mauer ran to safety out of fear that he would be struck by the truck. Officer Taylor testified that because the truck was moving backwards towards his partner, he fired two shots from his service weapon at the driver of the truck. Officer Mauer, hearing gunshots, ran back towards the vehicle and saw someone with a cover over his head that was secured by duct tape. Officer Mauer then saw the truck moving forward towards Officer Taylor. Both Officers Mauer and Taylor fired their service weapons one time at the driver of the vehicle. The truck then struck their undercover vehicle again, and it came to a stop. The officers were able to apprehend the occupants of the truck — Leon James, Umar Clark, and Lloyd Davis. James, the driver, was shot in the head and chest during the altercation and later died from his injuries.

{¶25} Umar Clark testified that he knew Gibson from the area where he grew up. On April 17, 2011, Clark stated that he received a telephone call from Gibson requesting his help in a kidnapping and advising him that he could make some money. Clark

testified that Gibson picked him up the following morning in a white Malibu and they drove by a house on Kipling Avenue, with Gibson pointing out that "the guy" lived there. According to Clark, they drove to Superior Avenue and East 114th Street and pulled up to a male parked in a purple or maroon SUV. Gibson then placed a phone call and three men came outside of house and got into the SUV. Clark testified that he only knew one of the men as "Leon." From there, the SUV and Gibson traveled to the house on Kipling, and Gibson parked his car down the street. As they waited, Gibson gave Clark a gun. According to Clark, because something did not go as planned, Gibson told Clark to get into the SUV and the three men who were originally in the SUV got into Gibson's car. As the SUV pulled away, Clark stated that he looked in the mirror and saw one of the men in the car with Gibson go up the driveway on Kipling.

{¶26} Later that day, Clark received a call from Gibson, who told him to meet him at his house on Herrick Avenue. Clark testified that Gibson told him that the kidnapped male was in the garage and that the money was ready to be picked up. Clark was instructed by Gibson to wait in the garage with the victim and Leon James.

{¶27} Jay Hillsman testified that Gibson called him and told him that he needed help and would pick him up. When Hillsman got into Gibson's white Malibu, Gibson told him that he needed Hillsman to make calls to Don Davis and negotiate a ransom amount and drop location. According to Hillsman, this occurred all afternoon, and he was lying down in the backseat negotiating with Don while Gibson drove around Don's neighborhood. Hillsman testified that several times Gibson spotted what appeared to be

police cars, so they cancelled the first ransom pick up and decided on the car wash drop. Hillsman was instructed to pick up the ransom bag by the dumpster, and then walk up the street to where Gibson was parked in a Ford Taurus. According to Hillsman, when the police chase ensued, Gibson told him to throw the evidence out of the window.

{¶28} Ron Brunson testified that Gibson and "the other guy" asked him if he would go with them to get some money. Gibson wanted to use Brunson's car, a Ford Taurus. Brunson testified that they all got into the car, with Gibson driving. According to Brunson, the "other guy" was making several phone calls that appeared to be ransom calls. Brunson testified that, after several calls, they went to a car wash where the "other guy," who was "wearing red," got out of the car, walked to the dumpster, grabbed a duffel bag, and got back into the car. Brunson testified that as they were being chased by the police, the "other guy" was throwing phones out of the car window.

{¶29} At the close of the state's case, the state dismissed the receiving stolen property charge and the firearm specifications attendant to the failure to comply charge. The forfeiture specification was also dismissed attendant to the weapons while under disability charge was also dismissed. The trial court denied Gibson's Crim.R. 29 motion for judgment of acquittal.

{¶30} In his defense, Gibson called various witnesses who all testified that they saw Gibson throughout various times during the day of April 18th and that he was "acting normal." Erica Darby further testified that Gibson explained to her that Davis had been kidnapped, but that he was trying to help get Davis back. She stated that Gibson did not

call the police out of fear of retaliation, and that he ran from the police after the high speed chase because he was scared.

**{¶31}** Following the close of the defense's case, the trial court again denied Gibson's Crim.R. 29 motion for judgment of acquittal.

**{¶32}** The jury found Gibson guilty of all the remaining counts and specifications, and the court sentenced Gibson to an aggregate prison term of 38 years to life. Gibson now appeals, raising ten assignments of error, which will be reviewed and addressed out of order and together where appropriate.

## I. Sufficiency of the Evidence

**{¶33}** Gibson was charged with felony murder because accomplice Leon James was shot and killed by police during the course of the kidnapping for ransom enterprise. In his second assignment of error, Gibson argues that the evidence was insufficient to convict him of felony murder pursuant to R.C. 2903.02(B).

**{¶34}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶35} Under this assignment of error, Gibson contends that his convictions for felony murder were based on insufficient evidence. "Felony murder" under R.C. 2903.02(B) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

> Under the 'proximate cause theory,' it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. [A] [d]efendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the 'proximate result' of [d]efendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

*State v. Ervin*, 8th Dist. Cuyahoga No. 87333, 2006-Ohio-4498, quoting *State v. Dixon*, 2d Dist. Montgomery No. 18582, 2002-Ohio-541, citing *Moore v. Wyrick* (C.A. 8, 1985), 766 F.2d 1253; *see also State v. Lovelace*, 137 Ohio App.3d 206, 738 N.E.2d 418 (1st Dist.1999).

{¶36} Thus, for criminal conduct to constitute the "proximate cause" of a result, the conduct must have (1) caused the result, in that but for the conduct the result would not have occurred, and (2) the result must have been foreseeable. *State v. Muntaser*, 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, ¶ 38, citing *Lovelace* at 216. Foreseeability is determined from the perspective of what the defendant knew or should have known,

when viewed in light of ordinary experience. *Id.* It is not necessary that the defendant be able to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by the defendant. *Id.*; *State v. Losey*, 23 Ohio App.3d 93, 491 N.E.2d 379 (10th Dist.1985).

{¶37} In this case, the predicate acts charged were kidnapping (Count 6), aggravated robbery (Count 7), and felonious assault (Count 8). Gibson contends that the death of Leon James was not the proximate result of the predicate acts because the resulting death was "so extraordinary or surprising that it would be simply unfair to hold [him] criminally responsible for something so unforeseeable."

{¶38} In *State v. Ervin*, 8th Dist. Cuyahoga No. 87333, 2006-Ohio-4498, this court addressed a similar case where we held that the shooting of a kidnapped FBI informant by an FBI agent was a proximate result of the kidnapping; thus, sufficient to support Ervin's conviction for felony murder.

{¶39} In that case, Ervin and his codefendant, Waller, kidnapped Lester, who was an informant for the FBI. Instead of calling his family for the ransom money, the informant called the FBI, who then tracked their movements. Posing as Lester's family, the FBI told the kidnappers that they would pay the ransom, and arranged the ransom drop. Once Ervin and Waller arrived at the drop point, they were surrounded by SWAT and FBI vehicles. Ervin tried to break out of the blockade by ramming his car into

vehicles, while Waller started firing shots toward law enforcement. The FBI returned fire, killing Lester. Ervin was convicted of the murder of Lester.

{¶40} On appeal, Ervin argued that he was not the cause of the informant's death; rather, it was the FBI's fault. *Id*. at ¶ 22. This court stated that there was more than one cause to the informant's death, with the most immediate and obvious cause being the intervening act of the officer shooting at the driver of vehicle. *Id*. at ¶ 25. However, we stated that the officer shooting was not the "sole and exclusive cause" of death. *Id*.

> Had Ervin and Waller not kidnapped Lester and demanded a sum of money or drugs for his return, Lester would not have been shot. Had Ervin surrendered at the scheduled drop-off when the FBI SWAT team converged on his vehicle and had Ervin not driven his vehicle at SA Werth, Lester, the front-seat passenger, would not have been shot and killed. By kidnapping Lester, attempting to avoid apprehension, and driving at SA Werth, Ervin and Waller set in motion a chain of events in which one of the reasonably foreseeable consequences was the death of Lester. Thus, Ervin and Waller's conduct was a proximate cause of Lester's death for which Ervin is criminally responsible.

*Id*.

{¶41} Gibson contends that the facts in his case are different than *Ervin* because it was unforeseeable that the police would not have followed protocol in dealing with a hostage situation, and it was this failure to follow protocol that resulted in Leon James's death. We disagree.

{¶42} When Officers Mauer, Taylor, and Williams investigated the house on Herrick Road, there was no evidence that the vehicle or victim would be at this address. Officer Mauer testified that they went to the address to investigate, at the direction of Sergeant Ezzo, due to information received. By this time, Officer Mauer testified that

several hours had passed since the police apprehended the suspects, so he believed they were only looking for the vehicle or victim.

{¶43} Once they discovered that the victim's truck was inside the garage, the testimony and evidence reveal that the officers had no way of knowing who was in the truck, if they were armed, or if the victim was present. The record demonstrates that the chain of events happened suddenly, which required them to act quickly, and that this was not a typical "hostage" situation where the police know the location of the victim. In this case, the officers encountered the victim's truck, and when the driver of the truck decided to immediately flee, rather than comply with officer directives to "show me your hands," the police used their training and experience to apprehend the suspect. Therefore, whatever protocols were in place could not be implemented due to the immediacy of the situation.

{¶44} Moreover, evidence that a police officer did not follow protocol goes primarily to the reasonableness of the officer's conduct. *Lovelace,* 137 Ohio App.3d at 219, 738 N.E.2d 418. Again, "the test for proximate cause, however, is not whether [the officer's] response was reasonable, but, rather, whether [the officer's response] was reasonably foreseeable." *Id.*, citing *People v. Schmies*, 44 Cal.App.4th 38, 51 Cal.Rptr.2d 185 (1996).

{¶45} In *Lovelace*, the defendant led police on a high speed chase. During the course of the pursuit, one of the officers sped through an intersection, failing to stop at the stop sign. The police cruiser struck another car, causing the death of the driver.

Lovelace was charged with felony murder for the death of the driver of that car. The court found that the fact that the officer's actions violated departmental policy and were possibly criminal did not make the driver's death unforeseeable in the felony murder context. *Id.* at 219.

> [F]or something to be foreseeable[, it] does not mean that it be actually envisioned. As stated by the court in *Losey*, "It is not necessary that the accused be in a position to foresee the precise consequence of his conduct; only that the consequence be foreseeable in the sense that what actually transpired was nature and logical in that it was within the scope of the risk created by his conduct."

*Id.* at 219-220, quoting *Losey*, 23 Ohio App.3d at 96, 491 N.E.2d 379.

{¶46} Much like in *Ervin*, had Gibson not orchestrated a kidnapping of Davis, Leon James would not have been shot. If Gibson had disclosed the location of Davis after being apprehended, the officers would not have been surprised to find the stolen truck in the garage on Herrick Road, and James would not have been killed. Accordingly, the fact that the officers may not have followed protocol in dealing with a hostage situation does not negate Gibson's culpability in this matter.

{¶47} Leon James's actions of attempting to flee in Davis's truck was in furtherance of the aggravated robbery and conspiracy to kidnap Lloyd Davis that Gibson orchestrated. While intermittent assaults of Davis occurred throughout the day, this was an ongoing enterprise.

{¶48} The Ninth Appellate District has explained, "'Short of the absolute completion or abandonment of the whole enterprise,' a murder occurring after the commission of a robbery cannot be divorced from that robbery." *State v. Roper*, 9th

Dist. Summit No. 7786, 1976 Ohio App. LEXIS 6898, *3 (Feb. 25, 1976), quoting

*Conrad v. State*, 75 Ohio St. 52, 72, 78 N.E. 957 (1906).

> We cannot find absolute completion or abandonment of the whole enterprise here, where the perpetrators of the aggravated robbery continued to hold captive the only witness to their crime, after they left the scene of the robbery. A killing, to be within the felony-murder rule, need not be perfectly coincidental with the commission of the felony. *Conrad v. State, supra.* It need only be "immediately connected with [the] crime." *Conrad v. State, supra.* at 78. Our examination of the cases cited reveals that this immediate connection does not refer to any temporal immediacy, but rather to the intimate interrelationship of the felony with the killing; that is, their occupation of positions within a common scheme or chain of events.

*Id.*; *see also State v. Habig*, 106 Ohio St. 151, 160, 140 N.E. 195 (1922). Events may occur after the commission of the felony that prolong that felonious act so as to bring any killing that happens during the period of the prolonged act within the scope of the felony-murder doctrine. *Id.* at *4, citing *Conrad* at 73-74.

{¶49} Accordingly, viewing the evidence in the light most favorable to the prosecution, sufficient evidence was presented supporting Gibson's convictions for felony murder. The second assignment of error is overruled.

## II. Manifest Weight of the Evidence

{¶50} Gibson argues in his first assignment of error that his convictions are against the manifest weight of the evidence.

{¶51} A challenge to the manifest weight of the evidence "'questions whether the prosecution met its burden of persuasion.'" *State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 17, quoting *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982). The manifest-weight-of-the-evidence standard of review requires us to

review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 515 N.E.2d 1009 (9th Dist.1986), paragraph one of the syllabus. The discretionary power to grant a new trial should be exercised only in exceptional cases where the evidence weighs heavily against the conviction. *Thompkins*.

{¶52} In this case, Gibson does not challenge each individual conviction; rather, he contends that his convictions are against the manifest weight of the evidence because he did not plan the kidnapping, was not present at the scene of the kidnapping, and did not participate in the kidnapping. He also challenges the credibility of witnesses.

{¶53} The weight of the evidence suggests and it was revealed that Gibson was the mastermind behind the kidnapping of Davis. Therefore, whether he was present or participated in the kidnapping is irrelevant under a conspiracy theory of the case. Codefendants Clark, Brunson, and Hillsman testified that Gibson contacted them to help him facilitate a kidnapping. Gibson utilized Clark to watch Davis in the garage with Leon James, ordered Brunson to call Don Davis and demand the ransom, and needed Hillsman's car to pick up the ransom at the drop location. Therefore, the evidence showed that Gibson orchestrated and calculated the kidnapping for ransom.

{¶54} Finally, Lloyd Davis testified that the only voice he recognized throughout the day was that of Gibson's. According to Davis, he recognized Gibson's voice when

the kidnappers requested his brother's telephone number the second time. Davis testified: "He told me, give them your brother's number. Then he told me, he say, 'I'm not going to hurt you like these guys going to hurt you.'" Davis said he was familiar with Gibson's voice because of their family-like relationship and because two or three weeks before he was kidnapped, Gibson told him that his brother better watch himself because some guys were trying to set him up.

{¶55} Although Erica Darby testified that Gibson explained to her his actions that day, the jury was free to believe or disbelieve all or part of the witnesses testimony. The jury also heard that she was in a relationship with Gibson and that he was the father of her three children.

{¶56} Therefore, while Gibson may not have actively participated in the kidnapping or been physically present when the kidnapping occurred, the weight of the evidence demonstrates that he planned the kidnapping for ransom and called the shots throughout the day regarding the enterprise.

{¶57} Gibson further contends that the credibility of the witnesses who point to him as being the mastermind is questionable. Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections — observations that are critical to determining a witness's credibility. *State v. Clark*, 8th Dist. Cuyahoga No. 94050, 2010-Ohio-4354, ¶ 17, citing *State v. Hill*, 75

Ohio St.3d 195, 205, 1996-Ohio-222, 661 N.E.2d 1068, and *State v. Antill*, 176 Ohio St. 61, 66, 197 N.E.2d 548 (1964).

**{¶58}** The jury was able to judge the credibility of codefendants Hillsman, Clark, and Brunson because each testified about their criminal backgrounds, their plea deals with the state in exchange for their testimony against Gibson, and their culpability in the kidnapping of Davis. Furthermore, the jury heard questionable testimony from these witnesses and their self-serving motivations. Finally, defense counsel also brought to the jury's attention the inconsistencies between Davis's testimony and statements to police and the ransom amounts that were requested throughout the day. Accordingly, the jury had sufficient information to judge each witness's credibility and "the jury was free to believe all, part, or none of the testimony of each witness." *State v. Colvin*, 10th Dist. Franklin No. 04AP-421, 2005-Ohio-1448, ¶ 34; *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16.

**{¶59}** This is not the exceptional case where the jury clearly lost their way and a new trial must be ordered. The jury could not ignore the fact that Gibson was the driver of the vehicle that picked up the ransom bag, led police on a high speed chase, and fled on foot from police after crashing his vehicle, and ignored police commands to stop. Moreover, the jury heard that the location where Davis was being held was conveniently a property Gibson owned, and the white vehicle seen during the kidnapping, which Clark and Brunson stated Gibson was driving, belonged to Gibson's former girlfriend.

Accordingly, his convictions were not against the manifest weight of the evidence; this assignment of error is overruled.

### III. Sentence

#### A. Consecutive Sentences

**{¶60}** In his third assignment of error, Gibson contends that the imposition of consecutive sentences was contrary to law.

**{¶61}** We review consecutive sentences using the standard of review set forth in R.C. 2953.08. *State v. Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891, ¶ 10 (holding that the standard of review set forth by the Ohio Supreme Court in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, is no longer valid in light of the enactment of H.B. 86 and the "revival" of statutory findings necessary for imposing consecutive sentences).

**{¶62}** R.C. 2953.08(G)(2) provides two grounds for an appellate court to overturn the imposition of consecutive sentences: (1) the sentence is "otherwise contrary to law"; or (2) the appellate court, upon its review, clearly and convincingly finds that "the record does not support the sentencing court's findings" under R.C. 2929.14(C)(4). *Venes* at ¶ 11; R.C. 2953.08(G)(2).

**{¶63}** The presumption in Ohio is that sentencing is to run concurrent, unless the trial court makes the required findings for consecutive sentences set forth in R.C. 2929.14(C)(4). *State v. Wells*, 8th Dist. Cuyahoga No. 98428, 2013-Ohio-1179, ¶ 11; R.C. 2929.41(A).

**{¶64}** Under current R.C. 2929.14(C)(4), when imposing consecutive sentences, the trial court must first find the sentence is "necessary to protect the public from future crime or to punish the offender." Next, the trial court must find that consecutive sentences are "not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Finally, the trial court must find that one of the following factors applies:

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction * * *, or was under postrelease control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term * * * adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C).

**{¶65}** Compliance with this statute "requires separate and distinct findings in addition to any findings relating to purposes and goals of criminal sentencing." *Venes*, 8th Dist. Cuyahoga No. 98682, 2013-Ohio-1891, at ¶ 17, citing *State v. Jones*, 93 Ohio St.3d 391, 399, 2001-Ohio-1341, 754 N.E.2d 1252. The failure to make these findings is "contrary to law." *Id.* at ¶ 12.

**{¶66}** In this case, the trial court stated,

> Although the presumption in general is that there's a presumption of concurrent sentences, this Court is able to at its own discretion impose

consecutive sentences if necessary to protect and/or punish, to protect the community and/or punish the offender that is not disproportionate. I do find that the harm was so great or unusual that a single term does not adequately reflect seriousness of the conduct.

**{¶67}** Although the trial court did not strictly adhere to the verbatim language of R.C. 2929.14(C)(4), this court has repeatedly stated the trial court in making its findings is not required to use "talismanic words to comply with the guidelines and factors for sentencing." *State v. Mannarino*, 8th Dist. Cuyahoga No. 98727, 2013-Ohio-1795, ¶ 23, quoting *State v. Brewer*, 1st Dist. Hamilton No. C-000148, 2000 Ohio App. LEXIS 5455, *10 (Nov. 24, 2000). But it must be clear from the record that the trial court actually made the findings required by statute. *See State v. Pierson*, 1st Dist. Hamilton No. C-970935, 1998 Ohio App. LEXIS 3812 (Aug. 21, 1998). A trial court satisfies this statutory requirement when the record reflects that the court has engaged in the required analysis and has selected the appropriate statutory criteria. *See State v. Edmonson*, 86 Ohio St.3d 324, 326, 1999-Ohio-110, 715 N.E.2d 131.

**{¶68}** Accordingly, a review of the entire record demonstrates that the trial court engaged in the required analysis and made the necessary findings under R.C. 2929.14(C)(4) in ordering Gibson's sentences to be served consecutively. His third assignment of error is overruled.

### B. Merger

**{¶69}** Gibson was found guilty of three counts of kidnapping, which the court merged for sentencing, and the state elected to proceed to sentencing on Count 1. Gibson was also found guilty of three counts of murder with the predicate offenses being

kidnapping, aggravated robbery, and felonious assault. The court merged all the murder counts, and the state elected to proceed with sentencing on Count 7, where aggravated robbery was the predicate offense. Finally, the court merged the theft, grand theft, and aggravated robbery counts, and the state elected to proceed with sentencing on Count 4, aggravated robbery. The trial court then ordered that the sentences in Count 1 (kidnapping), Count 7 (murder), and Count 4 (aggravated robbery) all run consecutively. Gibson contends in his fourth assignment of error that these convictions should have all merged for sentencing.

{¶70} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the court held that a defendant's conduct must be considered when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25. *Johnson* at ¶ 44. Thus,

> a defendant can be convicted and sentenced on more than one offense if the evidence shows that the defendant's conduct satisfies the elements of two or more disparate offenses. But if the conduct satisfies elements of offenses of similar import, then a defendant can be convicted and sentenced on only one, unless they were committed with separate intent.

*State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, 922 N.E.2d 937, ¶ 36 (Lanzinger, J., concurring in part and dissenting in part).

{¶71} In other words,

> [i]f the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

*Johnson* at ¶49-50, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 50 (Lanzinger, J., dissenting).

**{¶72}** In this case, although this was an ongoing criminal enterprise, each act was committed with a separate animus. The kidnapping for ransom started in the morning when three males removed Davis from his home at gunpoint. A separate animus existed when the three males then robbed Davis of his jewelry and money at gunpoint to commit the offense of aggravated robbery. As the day progressed, a separate animus existed when the officers shot Leon James while he attempted to flee in Davis's truck; thus, committing the offense of murder with aggravated robbery as the predicate offense. The conduct by Gibson and his accomplices resulted in the commission of three distinct offenses committed separately with a separate animus as to each. As a result, the offenses do not merge for the purposes of sentencing.

**{¶73}** Accordingly, the trial court did not err in failing to merge these offenses at sentencing. Gibson's fourth assignment of error is overruled.

## C. Proportionality of Sentence

**{¶74}** Gibson contends in his fifth assignment of error that the trial court failed to consider proportionality in imposing a sentence under R.C. 2929.11(B).

**{¶75}** Relevant to this appeal, a felony sentence shall be "commensurate with and not [demean] the seriousness of the offender's conduct and its impact upon the victim,

and [shall be] consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

**{¶76}** The applicable analysis in assessing the proportionality of a sentence, however, is whether the sentence is proportionate to the severity of the offense committed, so as not to "shock the sense of justice in the community." *State v. St. Martin*, 8th Dist. Cuyahoga No. 96834, 2012-Ohio-1633, ¶ 13, quoting *State v. Chaffin*, 30 Ohio St.2d 13, 282 N.E.2d 46 (1972); *see also* R.C. 2929.11(B). In *State v. Berlingeri*, 8th Dist. Cuyahoga No. 95458, 2011-Ohio-2528, ¶ 12, we reiterated:

> There is no requirement that co-defendants receive equal sentences. *State v. Wickham*, 5th Dist. No. CT2006-0084, 2007-Ohio-1754, ¶29, citing *State v. Lloyd*, 11th Dist. No. 2002-L-069, 2003-Ohio-6417, ¶21 and *United States v. Fry* (C.A.6, 1987), 831 F.2d 664, 667. "Each defendant is different and nothing prohibits a trial court from imposing two different sentences upon individuals convicted of similar crimes." *Wickham* at ¶29, citing *State v. Aguirre*, 4th Dist. No. 03CA5, 2003-Ohio-4909, at ¶50. When that happens, "the task of the appellate court is to determine whether the sentence is so unusual as to be outside the mainstream of local judicial practice. We bear in mind that although offenses may be similar, there may be distinguishing factors that justify dissimilar sentences." *State v. Beasley*, 8th Dist. No. 82884, 2004-Ohio-988, ¶24 (internal citation omitted).

**{¶77}** This court has previously found that in order to support a contention that a sentence is disproportionate to sentences imposed upon other offenders, the defendant must raise this issue before the trial court and present some evidence, however minimal, in order to provide a starting point for analysis and to preserve the issue for appeal. *State v. Jones*, 8th Dist. Cuyahoga No. 99121, 2013-Ohio-3141, ¶ 17, citing *State v. Edwards*, 8th Dist. Cuyahoga No. 89181, 2007-Ohio-6068. A review of the record in the instant

case reveals that Gibson's counsel did not make any proportionality argument. Therefore, we can summarily overrule the assignment of error.

{¶78} Nevertheless, Gibson contends that the trial court was not consistent in sentencing the same offenders for the same crimes; specifically, his three codefendants. Gibson argues that his sentence of 38 years to life was disproportionate to Brunson's three-year sentence, Hillsman's eight-year sentence, and Clark's fourteen-year sentence because all of his codefendants had prior felony convictions, whereas he did not. Additionally, Gibson contends that the trial court heard testimony from his codefendants; thus, evidencing that his culpability was no greater than theirs. We disagree.

{¶79} First, Gibson fails to acknowledge that his codefendants all entered into plea agreements with the state of Ohio. Accordingly, while Gibson and his codefendants were all charged under the same indictment and with relatively the same charges, including murder, his codefendants pled guilty to lesser and fewer offenses, none of which were murder. Gibson, however, was found guilty of all the offenses that were ultimately sent to the jury and, after merger, was sentenced on two first-degree felonies, felony murder that carried a life tail, and other offenses that carried mandatory consecutive sentences. Therefore, based on the nature of the convictions alone, Gibson was facing more time than his codefendants. Moreover, the evidence at trial showed that Gibson had a familial relationship with the victim (which facilitated the offense), he orchestrated the offense, and he recruited each of his codefendants to participate. Additionally, the trial court was able to hear the evidence and the role each codefendant

and Gibson played in the kidnapping for ransom. Based on the foregoing, we cannot say that Gibson's sentence is so unusual as to "shock the sense of justice in the community."

{¶80} Gibson further argues that because the trial court failed to reference R.C. 2929.11(B) or the concept of "consistency" in imposing sentencing, his sentence should be vacated. Contrary to his argument, the trial court stated verbatim the exact portion of R.C. 2929.11(B) that he is challenging on appeal. Accordingly, the statements at the sentencing hearing and the sentencing journal entry indicate that the trial court considered all required factors of law, including R.C. 2929.11.

{¶81} Gibson's fifth assignment of error is overruled.

IV. Jury Instructions

{¶82} In his sixth and eighth assignments of error, Gibson contends that the trial court erred by failing to give proper jury instructions, specifically the accomplice testimony instruction pursuant to R.C. 2923.03(D) and the "flight" instruction.

{¶83} The record demonstrates that defense counsel did not object to the instructions that the jury received in this case. Accordingly, we address these assignments of error under the plain error standard. *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977) (a failure to object at trial constitutes a waiver of all but plain error on the issues on appeal).

{¶84} Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be an error that is plain or obvious and

that affected the outcome of the case. *In re: J.G.*, 8th Dist. Cuyahoga No. 98625, 2013-Ohio-583, ¶ 10, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. Courts are to notice plain error under Crim.R. 52(B) "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*

### A. Accomplice Instruction

**{¶85}** Gibson argues in his sixth assignment of error that the trial court failed to give the correct accomplice testimony jury instruction pursuant to R.C. 2923.03(D). Although no objection was raised regarding the accomplice instruction, this court has previously found that the failure to give the cautionary instruction can amount to plain error because the accomplice instruction is required to be given by law. *State v. Pagan*, 8th Dist. Cuyahoga No. 97268, 2012-Ohio-2197, citing *State v. Lett*, 160 Ohio App.3d 46, 2005-Ohio-1308, 825 N.E.2d 1158 (8th Dist.).

**{¶86}** Pursuant to R.C. 2923.03(D),

If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

"The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

{¶87} In this case, the trial court gave the following accomplice instruction:

Testimony of an accomplice. You have heard testimony from Jay Hillsman, Umar Clark, Junior, and Ron Brunson, other persons who pleaded guilty to or are accused of the same crime — crimes charged in this case and are said to be accomplices.

An accomplice is one who purposely or knowingly assists or joins another in the commission of a crime. Whether Jay Hillsman, Umar Clark, Junior, and Ron Brunson were accomplices and the weight to give their testimony are matters for you to determine. Testimony of a person who you find to be an accomplice should be viewed with grave suspicion and weighed with great caution.

{¶88} It is clear that the trial court did not give a verbatim instruction under R.C. 2923.03(D). Therefore the issue is whether the trial court gave a substantially similar instruction.

{¶89} In *State v. Estep*, 4th Dist. Ross No. 94CA2072, 1996 Ohio App. LEXIS 915 (Mar. 5, 1996), the court held that the heart of the statutory charge is that accomplice testimony is to be viewed with "grave suspicion" and "weighed with great caution." *See State v. Tumbleson*, 105 Ohio App.3d 693, 664 N.E.2d 1318 (12th Dist.1995); *State v. Adams*, 9th Dist. Wayne No. 2621, 1992 Ohio App. LEXIS 786 (Feb. 26, 1992).

{¶90} In this case, the trial court's instruction included both of these concepts. Accordingly, while the better practice would be to give the instruction as the legislature drafted, the trial court gave a substantially similar instruction, as allowed under R.C.

2923.03(D). Reiterating the First Appellate District, "[w]e emphasize that judges should not meddle with the instructions written in any statute, because a few more words of difference could well result in a reversal * * *." *State v. Williams*, 117 Ohio App.3d 488, 495 690 N.E.2d 1297 (1st Dist.1996).

{¶91} Gibson also summarily states that the court erred when it failed to instruct the jury that prior convictions of the witness could be used to evaluate credibility, which compounded the problem with the accomplice testimony instruction. A review of the record shows that the trial court gave the standard credibility instruction. While the trial court did not include in the instruction any mention of prior convictions, the record demonstrates that the jury was well aware of the criminal backgrounds of each witness. Furthermore, defense counsel reminded the jurors during closing arguments that the codefendants were accomplices and entered into plea agreements with the state in exchange for their testimony against Gibson. This reminder questioned the bias and motivation of these witnesses, which were included by the trial court in the general credibility instruction as considerations in weighing credibility.

{¶92} Accordingly, because counsel did not object to the instructions given or request any specific instruction on prior convictions, we cannot say, and Gibson has not demonstrated, how he was prejudiced by the trial court not including prior convictions its credibility instruction.

{¶93} Gibson's sixth assignment of error is therefore overruled.

## B. Flight Instruction

**{¶94}** Gibson contends that the trial court gave an "unwarranted, improper, and incomplete 'flight' instruction" to the jury. In this case, the trial court gave the following instruction to the jury on flight:

> Consciousness of guilt. Testimony has been admitted indicating that the defendant fled — fled the scene. This is why I don't give it to you, because I always make an error somewhere — fled the scene. You are instructed that fleeing the scene alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness and/or awareness of guilt. If you find that the facts do not support that the defendant fled the scene or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support — if you find that the facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by consciousness and/or an awareness of guilt, you may, but are not required to consider that evidence in deciding whether the defendant is guilty of the crime charged. You alone will determine what weight, if any, to give this evidence.

**{¶95}** Contrary to Gibson's assertion on appeal, this flight instruction was upheld by this court in numerous cases, including *State v. Vanderhorst*, 8th Dist. Cuyahoga No. 97242, 2012-Ohio-2762, ¶ 55, and *State v. Hamilton*, 8th Dist. Cuyahoga No. 86520, 2006-Ohio-1949.

**{¶96}** Accordingly, we find no error, plain or otherwise, in the court's instruction because it was neither incomplete nor confusing. Additionally, the instruction was warranted because evidence was presented that Gibson ran from the police after the high speed pursuit. Gibson's eighth assignment of error is overruled.

## V.  Prosecutorial Misconduct

**{¶97}** In his seventh assignment of error, Gibson contends that "prosecutorial misconduct during closing argument deprived him of a fair trial in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution."

**{¶98}** It is well-accepted that the prosecution is normally entitled to a certain degree of latitude in its concluding remarks. *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561 (1982). A prosecutor is at liberty to prosecute with earnestness and vigor. *Berger v. United States*, 295 U.S. 78, 88, 79 L.Ed. 1314, 55 S.Ct. 629 (1935). Nevertheless, a prosecutor may not make excessively emotional arguments tending to inflame the jury's sensibilities. *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 2001-Ohio-132, 749 N.E.2d 226. It is also improper, and professionally unethical, for a prosecutor, or any attorney, to attack, or make any attempt to disparage, the character of opposing counsel in front of the jury. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶99}** The test for prosecutorial misconduct is "whether * * * remarks [made by the prosecutor] were improper and, if so, whether they prejudicially affected the accused's substantial rights." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 145. The effect of the alleged misconduct must also be judged in the context of the entire trial, and not treated as an isolated incident in an otherwise properly tried case. *State v. Poole*, 116 Ohio App.3d 513, 524, 688 N.E.2d 591 (7th Dist.1996).

An appellate court should only reverse a conviction if the effect of the misconduct "permeates the entire atmosphere of the trial." *Tumbleson*, 105 Ohio App.3d at 699, 664 N.E.2d 1318. "The touchstone of [the] analysis is the fairness of the trial, not the culpability of the prosecutor." *Lynch* at ¶ 145. In analyzing whether an appellant was deprived of a fair trial, an appellate court must determine beyond a reasonable doubt whether, absent the improper questions or remarks, the jury would have found the appellant guilty. *State v. Maurer*, 15 Ohio St.3d 239, 266-267, 473 N.E.2d 768 (1984); *State v. Dixon*, 8th Dist. Cuyahoga No. 68338, 1997 Ohio App. LEXIS 915 (Mar. 13, 1997).

{¶100} Gibson contends that the prosecutor personally denigrated defense counsel, alluded to matters not supported by the evidence, infringed on Gibson's right to remain silent, and vouched for the credibility or lack thereof regarding certain witnesses.

{¶101} While we agree that some of the statements made by the state were inappropriate, we cannot say that when reviewing the entire closing statement and the trial as a whole, these instances denied Gibson a fair trial to the point that the jury would have acquitted Gibson if the comments were not made.

{¶102} Accordingly, Gibson's seventh assignment of error is overruled.

VI.   Ineffective Assistance of Counsel

{¶103} To establish ineffective assistance of counsel, a defendant must show that counsel's representation was deficient in that it "fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *State v. Sanders*, 94 Ohio St.3d 150, 151, 2002-Ohio-350, 761 N.E.2d 18, citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 694.

{¶104} In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland* at 689. A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bradley* at 141.

{¶105} In his ninth assignment of error, Gibson contends that he was denied effective assistance of counsel, and was not afforded his constitutional right to counsel pursuant to the Sixth Amendment and due process and a fair trial pursuant to the Fifth and Fourteenth Amendments of the United States Constitution. Specifically, Gibson contends that his trial counsel was ineffective for (1) failing to object or request certain jury instructions, (2) failing to object to the prosecutor's improper comments during closing arguments, (3) failing to make certain arguments during sentencing regarding merger and proportionality, (4) failing to bifurcate the charge of having a weapon while under disability to be tried before the bench, and (5) allowing the entire video of Umar Clark's prior testimony to be viewed by the jury. Finally, Gibson contends that the cumulative effect of counsel's errors denied him a fair trial.

{¶106} Gibson contends that his counsel was ineffective for failing to request an alibi jury instruction when the crux of his defense was that he was not present at the time of the kidnapping. Where a defendant files a timely notice of alibi, presents evidence to support the contention, and relies on alibi as the sole defense, the trial court has a statutory duty pursuant to R.C. 2945.11 to charge the jury on alibi, whether or not defendant requests such an instruction. *State v. Frost*, 164 Ohio App.3d 61, 2005-Ohio-5510, 841 N.E.2d 336 (2d Dist.); *State v. McDade*, 2d Dist. Montgomery No. 14339, 1995 Ohio App. LEXIS 29 (Jan. 11, 1995).

{¶107} In this case, Gibson did not file a notice of alibi; therefore, counsel was not ineffective for failing to request the instruction. Moreover, the state's theory of the case was that Gibson was the mastermind behind the kidnapping and did not actually participate in the kidnapping itself. Therefore, Gibson would not have been at the scene; thus, an alibi was irrelevant. A court's jury instructions must be geared to the charges contained in the indictment and the evidence adduced at trial and the issues flowing therefrom. *State v. Neal*, 8th Dist. Cuyahoga No. 36903, 1978 Ohio App. LEXIS 9948 (Mar. 16, 1978).

{¶108} Gibson further contends that his counsel was also ineffective for failing to request a proper instruction on accomplice testimony, flight, and witness credibility. These arguments are the basis for other assigned errors raised by Gibson within the appeal and previously addressed in this opinion. Having previously determined in his sixth and eighth assignments of error that the instructions given were sufficient, we

necessarily find that he was not denied his right to effective assistance of counsel for counsel allegedly failing to request proper jury instructions.

{¶109} Gibson also contends his counsel was ineffective for failing to object to the prosecutor's comments during closing argument. As previously stated in Gibson's seventh assignment of error, the prosecutor's comments, while improper, were not prejudicial to affect the outcome of the case.

{¶110} Gibson further argues that this trial counsel was ineffective for failing to effectively argue merger and proportionality at sentencing. We addressed merger and proportionality in Gibson's fourth and fifth assignments of error. Under both assignments of error, we found no error, plain or otherwise, with the trial court's decision in finding that Counts 1, 4, and 7 did not merge for sentencing, and that Gibson's sentence was not disproportionate to similar crimes committed by similar offenders.

{¶111} Regarding bifurcation of trial, we find that Gibson's contention that his counsel was ineffective for failing to request the trial court to bifurcate the weapons while under disability charge was an invited error by Gibson himself. Under the invited error doctrine, "a party is not entitled to take advantage of an error that he himself invited or induced." *State v. Doss*, 8th Dist. Cuyahoga No. 84433, 2005-Ohio-775, ¶ 5, quoting *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517. A defendant "'may not make an affirmative and apparent strategic decision at trial and then complain on appeal that the result of that decision constitutes reversible error.'" *Doss* at ¶ 7, quoting *United States v. Jernigan*, 341 F.3d 1273, 1290 (7th Cir.2003).

{¶112} A review of the record affirmatively shows that defense counsel requested that the weapon under disability charge be tried to the bench and Gibson would execute the necessary waiver of jury trial on this count. After the trial court explained the waiver to Gibson and a brief discussion occurred with Gibson and defense counsel, it was stated on the record that Gibson did not want to waive the jury trial on the weapon charge because it was "his desire to testify in this case, and that his prior convictions would come out in that event anyway." Accordingly, trial counsel was not ineffective as argued by Gibson.

{¶113} Gibson further contends that his trial counsel was ineffective for allowing the state to play the entire video of Umar Clark's prior testimony where it is heard that "he knows that Mr. Gibson carries a gun and he commits robberies." Again, this is invited error. The record is clear that defense counsel discussed this recording with Gibson and per counsel, "it was the client's wish that we put that video on." Accordingly, Gibson cannot argue that his counsel was ineffective when it was Gibson's choice to allow the state to play the entire recording.

{¶114} Finally, Gibson contends that he was prejudiced by the cumulative effect of counsel's alleged errors. The courts recognize that a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. In order to find cumulative error, we must find: (1) that multiple errors were committed at trial, and (2) there is a reasonable probability that the outcome of the

trial would have been different but for the combination of the separately harmless errors. *State v. Viceroy*, 8th Dist. Cuyahoga No. 97031, 2012-Ohio-2494, ¶ 21, citing *State v. Clark*, 8th Dist. Cuyahoga No. 89371, 2008-Ohio-1404, ¶ 62.

**{¶115}** Having found no errors with respect to Gibson's claim of ineffective assistance of counsel, the doctrine of cumulative errors is inapplicable. Further, as previously discussed, we find that Gibson has not been prejudiced by trial counsel's actions. Accordingly, Gibson's ninth assignment of error is overruled.

VII. Confrontation Clause

**{¶116}** In his tenth and final assignment of error, Gibson contends that he was denied his right to confront witnesses when the trial court would not allow him to cross-examine Umar Clark on the sentence he anticipated to receive once he testified against Gibson.

> While the Sixth Amendment to the United States Constitution * * * guarantees the right of a criminal defendant to confront the witnesses against him for the biases they may hold, the trial court retains wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, or relevance of the inquiry. While cross-examination itself is a matter of right, the extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.

*State v. Gonzalez*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903, ¶ 44 (1st Dist.), quoting *State v. McIntosh*, 145 Ohio App.3d 567, 578, 763 N.E.2d 704 (1st Dist.2001).

**{¶117}** As the *Gonzalez* court explained:

"Where limitations directly implicate the Sixth Amendment right of confrontation, we review the limitation de novo. Thus, when deciding whether limitations of cross-examination are permissible, 'courts have striven to distinguish between the core values of the confrontation right and more peripheral concerns which remain within the ambit of trial judge's discretion.'" *United States v. Nelson* (C.A.7, 1994), 39 F.3d 705, 708, quoting *United States v. Saunders* (C.A.7, 1993), 973 F.2d 1354, 1358. Limitations on cross-examination that deny a defendant "the opportunity to establish that the witnesses may have had a motive to lie" infringe on core Sixth Amendment rights, not merely the denial to counsel of the "opportunity to add extra detail to that motive." *Id.* Accordingly, "once this core function is satisfied by allowing cross-examination to expose a motive to lie, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury. The trial court may preclude 'cumulative and confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability.'" *Id.*, quoting *United States v. Robinson*, (C.A. 7, 1987), 832 F.2d 366, 373.

*Gonzalez* at ¶ 45.

{¶118} On direct examination, Clark testified that he was originally indicted "with all the offenses" — "three counts of kidnaping, murder, grand theft auto, weapons under disability, * * * aggravated robbery, * * * [and] felonious assault." He admitted he made a deal with the state to plead guilty to "manslaughter, aggravated robbery, kidnapping, and a three-year gun specification." He testified that the offenses all carried a sentence of three to eleven years in prison and that he was facing three years on the firearm specification. When the prosecutor asked Clark what he was expecting to get for a sentence, Clark replied, "I don't know."

{¶119} Thereafter, defense counsel cross-examined Clark on the deal that he made with the state. Clark admitted again that his plea was a reduction from the original charges; however, he denied that he was told that he was "going to be looked after" and

the state objected to further questioning on this issue. The trial court sustained the prosecutor's objection when defense counsel asked Clark, "what do you anticipate is going to happen at your sentencing?"

{¶120} Under our standard of review, we must determine whether "'the jury had sufficient information to make a discriminating appraisal of the witness's motives or bias.'" *Gonzalez*, 151 Ohio App.3d 160, 2002-Ohio-4937, 783 N.E.2d 903, at ¶ 48, quoting *Nelson*, 39 F.3d at 708, quoting *United States ex rel. Ashford v. Director, Ill. Dept. of Corr.*, 871 F.2d 680, 683 (7th Cir.1989).

> The primary question in this context is whether a defendant has been afforded an opportunity to expose a cooperating witness's subjective understanding of his plea bargain because it is the witness's subjective understanding that is probative of bias or motive. *United States v. Ambers* (C.A.4, 1996), 85 F.3d 173, 176. Thus, the pertinent inquiry is what a witness believed his sentence would have been, rather than the actual sentence. *Id.*

*Gonzalez* at ¶ 48.

{¶121} In support of his argument, Gibson cites this court's opinion in *State v. Strowder*, 8th Dist. Cuyahoga No. 85792, 2006-Ohio-442. In *Strowder,* we held that the trial court abused its discretion in preventing Strowder's counsel from questioning a codefendant about his actual understanding of what sentence he was facing because the codefendant fluctuated in his testimony between the number of counts he was originally charged with; thus, there was some question then as to what he understood his total sentence would have been had he not entered a plea. *Id.* at ¶ 17 and 18.

{¶122} However, the facts in this case are distinguishable. While Gibson's counsel was prevented from asking Clark what he anticipated was going to happen to him at sentencing as a result of the plea deal, the state had already elicited testimony from Clark during direct examination that he did not know what his sentence would be. Accordingly, the jury was already apprised that Clark was originally facing the same indictment as Gibson, that he entered into a plea deal with the state pleading guilty to fewer charges, and that he was subject to three to eleven years on each count and three years on the firearm specifications. Additional examination by Gibson would have been cumulative, especially when Clark had testified that he did not know what his sentence would be. Moreover, if Clark would have testified what sentence he was originally facing under the indictment, the jury would then know the possible sentence that Gibson was facing because Clark testified that he was charged under the same indictment as Gibson. This information would have prejudiced the jury.

{¶123} Accordingly, we find no abuse of discretion by the trial court in limiting Gibson's cross-examination of Clark because the jury had sufficient evidence allowing them to make a credibility determination of Clark's motives and bias in testifying against Gibson. Gibson's final assignment of error is overruled.

{¶124} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


KATHLEEN ANN KEOUGH, JUDGE

LARRY A. JONES, SR., P.J., and
EILEEN A. GALLAGHER, J., CONCUR