[Cite as *State v. Creer*, 2025-Ohio-1180.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                  :

      Plaintiff-Appellee,                :
                                       No. 114050

      v.                                           :

MICHAEL J. CREER, JR.,                      :

      Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 3, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-689050-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey Schnatter and Margaret Graham, Assistant Prosecuting Attorneys, *for appellee*.

Christopher M. Kelley, *for appellant*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Michael J. Creer, Jr. ("Creer") challenges his single conviction for murder following a jury trial. After a thorough review of the law and record, this court affirms.

## I. Factual and Procedural History

{¶ 2} On February 21, 2024, Creer and his codefendants, Drequan Wood ("Wood") and Andre Q. Pettaway, Jr. ("Pettaway") were indicted for an incident occurring on March 26, 2023, resulting in the death of Derrion Miller ("Miller" or "Monty").[1]

{¶ 3} Creer was charged with murder, felonious assault, six counts of improperly discharging a firearm at or into a habitation or school safety zone, discharge of firearm on or near prohibited premises, and having weapons while under disability. Every count included one-, three-, and five-year firearm specifications and 18- and 54-month firearm specifications. The felonious assault, improper discharge into habitation or school safety zone, and discharge near prohibited premises counts also included notice of prior conviction specifications. The murder and improper discharge into habitation or school safety zone counts included repeat-violent-offender specifications.

{¶ 4} Creer elected to have his having weapons while under disability charge tried to the bench, along with all repeat violent offender specifications and all notice of prior conviction specifications. A joint jury trial for all three codefendants commenced on April 29, 2024, where the following testimony was adduced.

---

[1] Wood and Pettaway have also appealed their convictions, which have been assigned as companions to this matter and will be disposed of separately in *State v. Wood*, No. 114064 and *State v. Pettaway*, No. 114051.

**A. Shardasia Cannon**

{¶ 5} Shardasia Cannon ("Cannon"), who was 22-years-old at the time of trial, was in her home at 6970 Kinsman Road, a Cuyahoga Metropolitan Housing Authority ("CMHA") dwelling, in the early morning hours on March 26, 2023, with Brandon Abercrombie ("Abercrombie"), the father of one of her children; Shaniya Alston ("Alston"), her sister; Kaevonna Smith ("Smith"), a friend who was pregnant; and Miller, Smith's boyfriend and father of her unborn child. The group had returned to Cannon's home between 2:40 a.m. to 3 a.m. Cannon's three children were with their grandmother at another location, though they usually reside at 6970 Kinsman with Cannon.

{¶ 6} Upon returning home, Abercrombie and Miller began playing a video game in the living room, while Alston and Smith sat and observed. Cannon was cooking in the kitchen, which was only separated from the living room by a small wall/counter. The living room window is in the front of the home, and the kitchen windows face a back parking lot area. Cannon made a plate of chicken nuggets and fries in the kitchen then sat down on the couch among the others. Cannon stated that they had only been home for about a half hour, and "shots just get to going off." (Tr. 490.) Cannon elaborated that the shots came through the back window, through the kitchen, and into the living room where they were all sitting.

{¶ 7} In response to the shots, Alston dropped to the ground, while Miller and Abercrombie ran towards the upstairs, sort of lingering on the staircase between the upstairs and downstairs directly at the front of the home. Cannon encouraged

Alston to come upstairs with them, when she realized that Smith was asleep on the couch. Cannon believed that Miller was shot when he paused on the stairs to tell Smith to wake up.

{¶ 8} The group remained upstairs as the shots continued coming into the home. Miller's condition worsened, and the group dialed 9-1-1 and requested medical assistance. At some point, Abercrombie went back alone to investigate whether people had actually entered the home.

{¶ 9} When the police arrived and asked Cannon if she knew who could have been responsible for the shooting, she suggested her ex-boyfriend, Rayshawn Wicks ("Wicks"), because he was involved in an altercation earlier that day with Abercrombie at Cannon's home, and Wicks sustained an injury to his face during this altercation. Wicks had sent Cannon text messages prior to the shooting indicating that "he was basically going to come back and shoot up the house." (Tr. 501.)

{¶ 10} After the shooting, five shell casings were found inside the home. When asked about these, Cannon stated that she did not see anyone shooting from inside the residence and that her ears were ringing. She admitted, however, that she knew that Abercrombie had a gun on him that evening and testified that he later admitted to her that he had been firing his gun during the shooting. Cannon did not initially tell police that Abercrombie had a gun on him because he was not allowed to own a gun and she did not want him to go to jail.

{¶ 11} When asked about Creer, Cannon indicated that she was familiar with him from social media, but did not personally know him. She identified him as "Juice" and identified Creer in the courtroom. She also testified that she gave the police Creer's Instagram username, "dex.homie.juice."

**B. Kaevonna Smith**

{¶ 12} Smith testified that Miller fathered her youngest child and that they had been dating for about eight months before this incident occurred.

{¶ 13} Smith's testimony of the events leading to the shooting was mostly consistent with Cannon's testimony, though Smith had not been present for the fight between Wicks and Abercrombie that occurred at Cannon's residence on the prior day.

{¶ 14} Regarding the shooting, Smith testified that while she was on the couch, she had fallen asleep. She was awakened by "the dust of the bullets being fired falling on [her] face." (Tr. 561.) She acknowledged that Miller apparently paused to wake her up before he proceeded upstairs, but she never saw Miller and only observed Abercrombie and Alston still downstairs upon waking. When she got upstairs, she observed Miller "hovering over the tub. [Cannon] is in the back of him holding him. And [Alston] is right there on the side." (Tr. 564.) Smith testified that she called Miller's family members before calling 9-1-1.

{¶ 15} When the police arrived, Smith recalled showing them text messages that she had received on a cell phone that she shared with Miller. Wicks sent a text

message at 6:31 p.m. stating, "Yall all dead in that bitch."  (Exhibit Nos. 250 and 252.)

{¶ 16} Smith testified that she did not see anybody inside of the residence with a gun but knew that "probably [Abercrombie]" had a firearm on his person that night.  (Tr. 570.)  She denied seeing or hearing anyone in the home firing return shots, and continued to deny this fact during trial.

{¶ 17} Regarding Creer, Wood, and Pettaway, Smith testified that they used to be her friends back in 2021 and 2022.  She denied knowing if the defendants had any issues with anyone who had been inside Cannon's home that night.

**C. Shaniya Alston**

{¶ 18} Alston's testimony of the events leading up to the shooting was also consistent with the testimony given by Cannon and Smith.  Alston testified that about ten minutes after Cannon walked back into the living room with her plate of chicken nuggets and fries, "random bullets [were] just flying through the house." (Tr. 592.)

{¶ 19} Alston recalled that Cannon and Miller initially proceeded towards the upstairs, but Miller doubled back when he realized that Smith was asleep on the couch.  Alston testified that she had immediately laid on the floor and moved the couch towards her in an attempt to get out of the path of the bullets, but eventually proceeded upstairs with everyone else.  Alston also corroborated that Abercrombie went downstairs alone, for less than a minute to ensure that no one entered the house.

{¶ 20} Alston also testified that Abercrombie would have been the only person in the house who had a gun that evening because he "always had a gun," but that she did not see him "do anything" with a gun that night. (Tr. 592.) On cross-examination, Alston admitted to hearing "someone shooting from within the house." (Tr. 614.)

{¶ 21} Alston testified that she was present for the altercation that occurred earlier in the day between Wicks and Abercrombie. She described that Wicks "was getting smart with [Abercrombie]," who "has a very short temper," so Abercrombie "smacked [Wicks]" with his hand, and the altercation escalated from there and the two proceeded outside. (Tr. 601.) She did not observe any portion of the altercation that occurred outside.

{¶ 22} Alston also testified that during a later meeting with detectives, the detective had shown her exhibit No. 235, which she identified as a photograph of an individual named "Dre." She testified that she was confused when the detectives showed her the photo; though she knew "Dre," she did not expect that he would be involved in the incident and instead suspected Wicks because of the altercation that occurred earlier in the day. When asked to identify "Dre" in the courtroom, Shaniya identified Pettaway. The detectives had shown her another photograph, exhibit No. 238, which Alston identified with the detectives and again during trial as an individual named "Sav" who she "used to kick it" with. (Tr. 611.) When asked if this person was in the courtroom, she identified Wood. She did not know or recognize Creer at any stage of the investigation or trial.

### D. Dimitri Blackwell

{¶ 23} Patrol Officer Dimitri Blackwell ("Ofc. Blackwell") of the Cleveland police was patrolling with Officer Sedlack on the morning of the incident when he was called to the scene around 3 a.m.

{¶ 24} Upon arriving, Ofc. Blackwell testified that he proceeded upstairs and saw Miller laying on the upstairs bathroom floor, "unconscious but breathing" and unresponsive. (Tr. 628.) Ofc. Blackwell testified that he saw "apparent bullet holes all throughout the living area, kitchen and living room of the residence" and "multiple shell casings . . . in the south side parking area," as well as "at least one casing inside the house . . . ." (Tr. 632 and 634.) He did not collect these items. At this very early stage of the investigation, Ofc. Blackwell's only suspect was Wicks based on discussion with the victims. Ofc. Blackwell and Ofc. Sedlak proceeded to University Hospitals where Miller was being treated, but they were unable to speak with him, which concluded Ofc. Blackwell's involvement with this matter.

### E. Vesna Piscitello

{¶ 25} Vesna Piscitello ("Piscitello"), a civilian analyst in the Cleveland police Real Time Crime Center, testified that she assisted Detective Andrew Hayduk ("Det. Hayduk") with the investigation of the shooting by reviewing footage from cameras placed in various locations around Cleveland. She was tasked with locating a suspect vehicle, a Kia Sportage, which she first tracked around East 93rd and Benham.

{¶ 26} During the course of her investigation, Piscitello identified that after the shooting, the Kia made stops at a Shell gas station and The Rapid Stop gas station

at East 55th and Payne Avenue. She immediately provided this information to Det. Hayduk to retrieve any surveillance footage. She also assisted the police with downloading cell phone information from Cellebrite from the phones of Wicks and Creer and looked into the social-media evidence.

{¶ 27} Regarding the social-media investigation, Piscitello noted that she investigated Instagram accounts associated with Wood ("4evasavv"), Pettaway ("_beenchasindre"), and Creer ("dex.homie.juice" and "dex.homie") after the victims provided these usernames to detectives. Piscitello testified that the photographs of the car occupants obtained from the gas station surveillance footage matched the individuals in the respective Instagram accounts. She described that in the gas station photographs, each suspect wore very distinctive clothing — a red sweat suit, a puffy red, white, and blue striped jacket, and a grey hoodie.

### F. Detective Walter Emerick

{¶ 28} Detective Walter Emerick ("Det. Emerick") testified that he is a crime-scene detective with the Cleveland police. He responded to Cannon's residence shortly after the shooting. When he arrived, he conferred with the other officers on scene, conducted a walkthrough, and observed bullet holes throughout the home, spent cartridge casings, and the damage to the home. On cross-examination, Det. Emerick stated that there was no evidence of the suspects shooting into the upstairs of the home and that he had done "a cursory search for any holes[.]" (Tr. 727.)

{¶ 29} Det. Emerick testified that he began "working the scene," starting on the outside where the spent cartridge casings were located and "marking each item

as we walk through again, noticing bullet defects, suspected bullet defects to the house . . . [j]ust marking what we can see, what we think is significant enough to document." (Tr. 687.) He photographed all marked evidence and identified them as exhibit Nos. 1 through 122. He collected an estimated 41 shell casings, which were swabbed for suspected touch DNA and also took a sample of suspected blood found on the front stoop for testing.

{¶ 30} Det. Emerick identified the spent cartridges from the outside of the home as either "a Blazer nine millimeter Luger cartridge casing," "a GFL nine millimeter Luger cartridge casing," "a SAR nine millimeter Luger cartridge casing," a "S&B nine by nineteen cartridge casing," "a spent MXT nine by nineteen nine millimeter cartridge casing," "a Win nine millimeter cartridge casing," "a Hornady nine millimeter Luger cartridge casing," "a GFL nine millimeter Luger cartridge casing," and a "Sig . . . nine milli[meter] Luger cartridge casing." (Tr. 694-703.) While a variety of brands were identified, Det. Emerick clarified that "[a]ny nine millimeter will fire out a nine millimeter handgun. Brand doesn't matter" and "the brands are not specific to any particular weapon." (Tr. 747.)

{¶ 31} Det. Emerick identified several photographs he took of suspected damage caused by bullets to the outside of the home directly behind the kitchen area. He testified that these bullet holes showed consistent trajectory, because the holes in the window corresponded with holes in an outdoor grill that had been stored inside of the home, "consistent with that hole to the next hole to the next hole . . . show[ing] transition through the home." (Tr. 705.)

{¶ 32} Det. Emerick testified that there were five spent casings recovered inside of the home. He identified exhibit No. 106 as showing a spent cartridge casing found inside of the home, "a spent Win nine[-]millimeter Luger cartridge casing." (Tr. 714.) Exhibit No. 108 showed a "spent S&B nine by nineteen cartridge casing" that Det. Emerick found in a blanket. (Tr. 714.) Other spent cartridge casings found inside of the home were identified as "spent FC nine millimeter Luger cartridge casing[s]," a "PMC nine millimeter cartridge casing," and "a spent GFL nine millimeter cartridge casing." (Tr. 713-716.) Only one bullet fragment was collected inside of the home, which Det. Emerick identified as exhibit No. 104.

{¶ 33} Upon review of exhibit No. 115, Det. Emerick identified the photograph as one he took of the front window of the home that depicted bullets "going out because there's no indication [of] anything going inward from this angle." (Tr. 717.) He clarified that these bullets were going through the front window, but no spent rounds were collected from these defects because "[t]hey were in the walls. They lost energy, went across the street, in trees. It was real dark out. But we didn't find anything that was directly evident to pick up." (Tr. 723-724.)

**G. Tom Ciula**

{¶ 34} Tom Ciula ("Ciula") testified that at the time of this incident, he was employed by the Cleveland Division of Police and ran the forensic video lab for the homicide unit. In January 2024, he compiled a video showing the "full sequence of what happened that evening . . . ." (Tr. 757.)

{¶ 35} He described that in compiling this video, he was looking for three people of interest. The first "is wearing pretty much all red." The second "is wearing a tricolored jacket, stripes in a horizontal pattern from top to bottom." The third "is wearing a gray hoody." (Tr. 760.) Ciula went through the compilation video, exhibit No. 223, and walked the jury through the various videos showing the three persons of interest.

{¶ 36} Ciula testified that both before and after the shooting, he was able to determine that the person in red drove the vehicle, the person in the gray hoody was in the passenger seat, and the person in the striped jacket was in the backseat. When the compilation video proceeded to the CMHA surveillance footage of the incident, Ciula, upon examining the first marked muzzle flash in the video stated that "[t]here is insufficient detail in this video to say with certainty exactly where those flashes are coming from. But it is from that vehicle and it is from the driver's side." (Tr. 775.) As for the second muzzle flash, he stated that "[t]his occurs further towards the back of the vehicle indicative of coming from the backseat." (Tr. 775.) He stated that approximately four muzzle shots were captured on the video, but because of the nature of the surveillance video (which captures about eight frames per second), "[t]hat does not have anything to do with how many times a weapon may or may not have been fired. It's just those are the four that were captured on a video frame." (Tr. 776.) When asked if 41 casings were probable based on this video, Ciula responded that "[i]f there were 41 casings found, that weapon was being fired rather

quickly, so it's not surprising that an eight frame a second would miss the majority of those flashes." (Tr. 789.)

### H. Curtiss Jones

{¶ 37} Curtiss Jones ("Jones"), the supervisor of the Trace Evidence Unit at the Cuyahoga County Medical Examiners Office, testified that he was assigned to investigate Miller's homicide. He testified that he completed "an examination of the decedent's hands," collected samples, "specifically gunshot primer residue . . . or a sample for potential gunshot primer residue examination . . . from the hands of [Miller], as well as swabs from under the fingernails of [Miller]," and hand swabs, none of which were actually tested despite their collection, and no request was ever received for collection from any party involved with this matter. (Tr. 806-807 and 828.)

{¶ 38} Jones testified that he did not receive any clothing that Miller was wearing during the homicide, but did receive clothing from Cleveland police, which he identified at trial as exhibit Nos. 209 through 216. This included a red sweatshirt that was allegedly worn by Wood. Regarding this piece of evidence, Jones testified that "five particles with a spiracle normal appearance containing lead, barium and antimony were located on the sample collected from the sleeve cuffs of the red hooded sweatshirt," which he testified could lead to the conclusion that "the presence of gunshot primer residue characteristic particles on the sleeve cuff sample, would indicate that item was either worn by someone shooting a gun, or by a person near the shooting of a gun, or the surfaces of the hooded sweatshirt that

were tested, there was a transfer of gunshot primer residue from a surface to the sleeve cuffs." (Tr. 818.) On cross-examination, Jones admitted that he could not determine when these particles landed on or came into contact with the cuffs of the sweatshirt.

{¶ 39} On cross-examination, Jones also conceded that "[i]f somebody was wearing that sweatshirt in a vehicle and there was a separate individual shooting in that same car . . . [he could] anticipate gunshot residue could deposit on the clothes of someone in close proximity." (Tr. 826.) He elaborated that in a vehicle, this depends on factors such as if a full arm is extended out of the window versus shooting from the inside of the vehicle.

## I. Kristen Koeth

{¶ 40} Kristen Koeth ("Koeth") testified that she is a forensic scientist, firearm and toolmark examiner with the medical examiner's office. She testified that she has four main duties, "performing test fires" to check guns submitted for operability and collect the spent bullets and cartridge casings for comparison, "serial number restoration," for when the serial number has been defaced or removed from the firearm, utilizing "NIBIN, the National Integrated Ballistics Information Network," a reference system that "stores images of fired cartridge cases," and "microscopic examination and comparison of fired bullets and fired cartridge cases." (Tr. 836-838.)

{¶ 41} Koeth test fired a MasterPiece Arms, the only weapon recovered during this investigation, a 9 mm caliber pistol with serial number FX33192,

provided by the Cleveland police and found that it was operable. Additionally, she was able to confirm that the weapon was semiautomatic.

{¶ 42} She also tested the 41 recovered spent nine-millimeter caliber cartridge casings recovered from the scene. From the casings, she was able to determine that three different guns had been involved. Eleven of the cartridge cases were fired from the same firearm. There was also a group of five spent cartridge casings that she determined came from an unidentified firearm. Koeth then testified that a group of 25 cartridge casings were "identified as having been fired from the Masterpiece Arms." (Tr. 858.)

{¶ 43} Koeth also testified about submitted bullets and bullet fragments that were provided to her. Of note was a bullet that had been received from the medical examiner's office that was removed from Miller's right pelvis. After examination, she determined that this bullet did not come from the MasterPiece Arms gun.

{¶ 44} Later during trial, the State recalled Koeth to clarify her earlier testimony on the three groups of shell casings that she was able to separate, as well as the recovered bullets. She clarified that the pellet that came from Miller's pelvis was not fired from the MasterPiece Arms, and she determined that it likely came from a Glock or Glock-type gun. She clarified to the jury that only the group of 25 shell casings found outside came from the MasterPiece Arms. The other 11 found outside and the five found inside came from two different guns, neither of which was the MasterPiece Arms.

**J. Mark Evans**

{¶ 45} Mark Evans ("Evans") testified that he is employed by the FBI Cleveland Division and assigned to the Northwest Ohio Violent Crime Task Force and is assigned to the FBI Cellular Analysis Survey Team, which he described as a group of agents who "read[] cellular phone records, creat[e] cellular phone mapping, identif[y] phone locations, and us[e] these to help with criminal investigations." (Tr. 866.)

{¶ 46} Evans testified that he was brought into the investigation of this incident by Det. Hayduk. He investigated two cell phone numbers that were provided to him: 216-409-4748 ("4748") and 216-559-8883 ("8883"). He did not receive any names associated with these telephone numbers. He did, however, receive all areas of interest that the suspect vehicle was spotted at or near, including 3224 East 93rd Street, 2625 East 55th Street, and 1712 East 55th Street.

{¶ 47} The first items that Evans reviewed were the call detail records, which "document the interaction to and from the target cell phones and [] document the cell phone tower and the sector." (Tr. 873.) From these, he noted that at 12:17:15 a.m., 8883 made an outgoing call that lasted for 75 seconds to 4748. Evans then noted that at "1:57 a.m. you can see that telephone number [4748] hasn't moved. It's still located down here south of Cleveland. However, phone number [8883] at 1:57:11 [a.m.], so three seconds follow is . . . utilizing the same tower to make that call, the same tower and sector [as 4748]." (Tr. 881-882.) In other words, these two devices were now in close proximity. Moving onto 2:19 a.m. through 2:51 a.m.,

"4748 is in the general location of 3224 East 93rd Street in Cleveland, Ohio. You can also see that at that same time [8883] has four outgoing telephone calls utilizing the same tower that the [4748] device is utilizing, showing that they're utilizing the same tower." (Tr. 882-883.) From 2:51 a.m. until 3:02 a.m., 4748 was the only number that Evans had data from, and at around 2:55:02 a.m., the phone is using a different side of the tower, "facing more in that north, northwest direction." (Tr. 883.) At 3:00 a.m., the device is moved, and the device receives two incoming voice calls that were not answered. At 3:08 a.m., both numbers were utilizing the same tower, which indicated "that those two devices were . . . in close proximity to the same time." (Tr. 885.) Both devices also utilized the same tower and sector around 3:13 a.m. to 3:18 a.m. The devices finally separated around 4:32 a.m., when the devices utilized two different towers in the area of Harvard Avenue.

{¶ 48} Evans was able to use this data to corroborate that both devices "are in and around the area of 3224 East 93rd Street in Cleveland. Then they move to the area of 2625 East 55th Street, where again they're utilizing the same tower, and then move north to 1712 East 55th Street in Cleveland." (Tr. 887.) He also testified that based on the data he reviewed, both devices "could have gone past 6970 Kinsman Road" between 2:55 and 2:57 a.m. (Tr. 887.) After the time of the incident, "both devices are located utilizing cell phone towers in the area of 2625 East 55th Street, also in Cleveland, Ohio." (Tr. 888.)

**K. Gabrielle Zilich**

{¶ 49} Gabrielle Zilich ("Zilich"), a crime analyst in the Cuyahoga County Prosecutor's Office, testified that she reviewed and mapped phone records related to the shooting. Zilich explained that she uses a program called ZetX to perform her work, and it extracts data such as incoming and outgoing phone calls, timing advance records, tower pings, or locations that come from a phone extraction.

{¶ 50} Zilich also examined data from 4748, which she learned was associated with Creer and 8883, which she learned was associated with Wood. She received data from Pettaway's alleged cell phone, but no mappable data existed during the time frames that she examined. She testified that "ZetX pretty much puts these phone records on a map." (Tr. 903.) Zilich matched these maps with the surveillance videos given to her and created an exhibit that was introduced as exhibit No. 222. She stated, even though some of the data was only intermittently received, the two numbers were "pinging" off of the same cell tower at many points during the morning of this incident.

**L. Brandon Abercrombie**

{¶ 51} Abercrombie, after being uncooperative throughout the investigation, appeared for trial unexpectedly. Abercrombie's testimony aligned with the other victims' testimony.

{¶ 52} He testified that "right after [Cannon] came out the kitchen to sit back down, like probably about two to three minutes I turn to her and I look back up. And

as I'm looking up, I can see like blinds in the curtains fly . . . bullets coming through the wall and debris flying everywhere." (Tr. 948.)

{¶ 53} Abercrombie admitted that on the morning of the shooting, he had been carrying a firearm that he received from his brother, but he did not know what type of gun it was. He testified that after the shooting began, "there was a lot going on . . . three, four seconds after [] I heard it, that's when I, like, returned fire and ran upstairs." (Tr. 949.) He claims that the gun was stored in a backpack, but was unable to point out the backpack in any photos. He continued, "[S]o as I return the fire, they ran, like, upstairs, but like they couldn't go upstairs because like the top – the top half of the house was also getting shot at, so they was just on the stairs." (Tr. 949.)

{¶ 54} Abercrombie elaborated that he was able to discern that the bullets were coming in from the back of the house, through the kitchen, and into the living room, and thus he shot or returned fire in that direction. He stated that he was "sitting on the couch and . . . [t]hey ran upstairs and I just stood up and I started shooting back." (Tr. 950.) He testified that at the time he returned fire, Miller had been on the stairs, and to his knowledge, Miller had already been hit. When questioned if it was possible that one of his bullets could have struck Miller, Abercrombie admitted that "[i]t's a possibility." (Tr. 951.) He stated that at no point was he shooting in any direction other than where the bullets were coming from. He estimated that he shot "maybe five, six rounds." (Tr. 951.)

{¶ 55} On cross-examination, Abercrombie reviewed exhibit No. 113, showing the front door of the home, and acknowledged that "a shell marked by marker number 43" had come from his gun, but he maintained that he never shot his gun through the front of the home.

{¶ 56} Abercrombie stated that he called 9-1-1, along with Smith, and stashed his gun under the bed because "I was afraid of having of a gun" "because I have like my own personal stuff going on, so I was afraid of like, I'd catch some charges with this gun." (Tr. 952.)

{¶ 57} Abercrombie admitted that he was initially untruthful with the police when he told them a fictitious name of another individual who was in the house returning fire. He testified that he lied because he was scared of picking up charges for having a gun. At trial, he stated that he had a change of heart and decided to testify because he had been promised by the State that they would not charge him with having weapons while under disability in relation to this incident. (Tr. 955.)

**M. Eric Strick**

{¶ 58} Eric Strick ("Strick") testified that he is an analyst in the crime-scene unit in the Cleveland police. Strick, along with Detective Duplaga, members of the homicide unit, and SWAT conducted a homicide search warrant on March 28, 2023, at 1124 East 67th Street. Strick testified that he did not know whose residence he was searching. While executing the search, Strick photographed and collected a red sweatsuit, a MasterPiece Arms firearm, and magazines for DNA testing. Strick testified that he swabbed the firearm. Included among Strick's photographs of the

scene were several pieces of mail bearing the address of 1124 East 67th Street that were addressed to "Drequan Wood."

**N. Kasharra Rivera-Hill**

{¶ 59} Kasharra Rivera-Hill ("Rivera-Hill") testified that around March 26, 2023, she met somebody named "Sav" through one of her friends after a party. (Tr. 1025.) Rivera-Hill identified "Sav" in the courtroom as Wood. She stated that the first time she met Sav, he picked her up from a gas station "[o]n Kinsman somewhere" in a "gray [Kia]." (Tr. 1026.) When shown exhibit No. 255, she identified the gray Kia Sportage that had been attributed to the defendants several times earlier in the trial as the vehicle that Sav drove when he had picked her up. She stated that Sav used a cell phone charger to start the Kia, which is typically observed in stolen vehicles. She testified that after he picked her up from the gas station, they returned to his home, which she identified from the photographs introduced during Strick's testimony. At his home, she "did his hair." (Tr. 1028.)

{¶ 60} She testified that while she was doing his hair, she touched and moved a firearm on the floor towards him. She identified that it was the same firearm that Strick had photographed during his search. She stayed at Wood's home for about "two or three" days, "but one of those days I had went home and came back." (Tr. 1030-1031.) During that time, she testified that the gun remained in the same place and that she remembered that she had previously seen the gun in the Kia when Wood picked her up.

### O. Marissa Esterline

{¶ 61} Marissa Esterline ("Esterline") testified that she is a forensic scientist in the Cuyahoga County Regional Forensic Science Laboratory, where she specializes in DNA. She described that as part of her typical job duties, she "process[es] evidence typically from a crime scene to develop DNA profiles from that evidence." (Tr. 1043.)

{¶ 62} Esterline received DNA swabs from Rivera-Hill, Wicks, Creer, Wood, and Pettaway, as well as a "victim's standard" buccal swab from Miller. (Tr. 1054.) She also received swabs from Miller's hands as well as swabs from the interior collar and sleeve cuffs of a red-hooded sweatshirt.

{¶ 63} She did not test any of the swabs from Miller's hand, because "there was no indication of contact between the decedent and any person of interest." (Tr. 1055.) The swabs from the sweat suit contained DNA from four contributors, including Rivera-Hill and Wood, and no statistical support matched the profiles of Derrion, Wicks, or Creer. A swab of blood from the front door area of the Kinsman home matched Wicks's DNA. A swab of blood from the back area of the Kinsman home matched Wicks's DNA as well.

{¶ 64} Relevant to Creer, Esterline confirmed that she received no evidence that Creer touched anything. (Tr. 1074.)

### P. Alison Krywanczyk, M.D.

{¶ 65} Alison Krywanczyk ("Dr. Krywanczyk") testified that she is a deputy medical examiner at the Cuyahoga County Medical Examiner's Office and that she

performed Miller's autopsy. She went through the autopsy photographs and discussed the various marks on Miller's body, identifying which were caused by life-saving care at the hospital and which were likely from the crime scene. She also went through photos of the bullets and fragments taken from Miller's body.

{¶ 66} Dr. Krywanczyk testified as to the significant autopsy findings. "Mr. Miller had a penetrating gunshot wound," that "entered the . . . groin area, and it passed through his ilium, which is the left side of the pelvis bone." (Tr. 1133.) She testified that the bullet had also "injured his left internal iliac artery. So that's the branching of the aorta as it reaches into the pelvis. So it's a very large caliber artery and it's in a very deep, difficult to access place. So it's not something you can easily put pressure from the outside. And it's difficult for surgeons to get into that in a timely fashion." (Tr. 1133.) She determined that his cause of death was "a gunshot wound to the pelvis with visceral, vascular, and skeletal injury." (Tr. 1134.) The manner of death was determined to be a homicide.

### Q. Detective Andrew Hayduk

{¶ 67} Det. Hayduk testified that he is a detective in the homicide unit of the Cleveland police, and that he investigated this case. Det. Hayduk stated that he began his investigation by going to the CMHA police to see if any of its surveillance cameras captured the shooting. Det. Hayduk testified that he gave this information, including "times, description of travel, and a basic description of [the Kia]" to Piscitello who began tracking the vehicle through the City of Cleveland cameras. (Tr. 1163.) He learned from Piscitello that "just a couple minutes after this incident a

short distance on Kinsman Road on 55th the car pulls into a Shell gas station." (Tr. 1164.)

{¶ 68} When asked how he was able to identify the vehicle, Det. Hayduk admitted that the vehicle did not have a license plate and there was nothing about the vehicle's appearance that they were able to use to identify it, except for the fact that it did not have a back license plate.

{¶ 69} This led Det. Hayduk to the gas station where he requested to review its surveillance footage. Upon review, he noticed that an individual "got out of the front passenger seat of that Kia and walked into the store . . . wearing a grayish G-Star hoodie. There's a clear face shot of this individual." (Tr. 1166-1167.) Upon review of exhibit No. 251, showing this individual, the detective relayed that he was able to identify this person as Creer. He later identified Wood as the individual dressed in an all-red sweatsuit getting out of the driver side door of the Kia.

{¶ 70} Piscitello also discovered that the vehicle, after proceeding to the Shell gas station, went to a Rapid Stop gas station at East 55th and Payne. Det. Hayduk obtained this video and described it as showing "that same Kia eventually back[ing] into a parking spot. But the male in all red and the male in the red, white, and blue coat exit that vehicle and go into the Rapid Stop and are caught on camera." (Tr. 1171.) He utilized these clear shots of the suspects inside of the gas station to asked Cannon, Alston, and Abercrombie if they recognized these people.

{¶ 71} Piscitello also found footage of the Kia prior to the shooting. "The Kia appears to be on East 93rd Street and drives to the Kinsman party center. There is

a liquor store in this plaza that also has video that we were able to recover there." (Tr. 1168.) From this video, Det. Hayduk was able to identify "two other individuals wearing distinct clothing that were coming in and out of that car and walking around that parking lot." (Tr. 1169.) He stated that "[t]here was also a[n] individual who was wearing a red, white, and blue kind of puffy jacket that was very distinct that was also consistently moving in and out of the back seat of the vehicle." (Tr. 1169.) According to Det. Hayduk, Creer, in the gray hoodie, "interact[ed] with those individuals in the car" and "appear[ed] to be together again moving in and out of that car at that Kinsman party center prior to the homicide." (Tr. 1169-1170.)

{¶ 72} Det. Hayduk showed a photo of the individual in the gray hoodie to Cannon, who identified him by the name "Juice." Cannon also showed Det. Hayduk this person's Instagram page and some text messages that were sent back and forth from this individual in her phone. He then provided the phone number to Evans and the prosecutor's office, whose respective investigations have already been outlined.

{¶ 73} Det. Hayduk testified that Woods was the first to be taken into custody following the search warrant. Then, "some point shortly after — again, we were able to identify the other two people that were in the car, suspects. And I issued warrants for their arrest and sent those warrants to the U.S. Marshals task force to try to locate them." (Tr. 1192.) After Woods was arrested, "a video was found again of the three suspects together from dex.homie.juice account, the Instagram account associated with Creer."

{¶ 74} Exhibit No. 228 is a video of an Instagram story from Creer's account showing him wearing the gray G-Star hoodie. Also identifiable in the video are an individual wearing an all-red sweat suit as well as an individual wearing a red, white, and blue striped puffy jacket, which Det. Hayduk testified as "consistent with Drequan Wood and Andre Pettaway both wearing the same clothing that they were wearing when this incident happened." (Tr. 1201.) The video contains text stating "Free Sav Onna Dead [n-word] @4evasavv." Det. Hayduk interpreted the term "onna dead" as "related to very serious. [sic] His dead friends he's referencing there. He wants to free Sav and this is serious is the way I take it." (Tr. 1200-1201.)

{¶ 75} Creer was apprehended during a traffic stop in April 2023. Det. Hayduk testified that he interviewed Creer, where Creer "[u]ltimately, . . . admits being in that car, driving around in it. He says he's very drunk and he had fallen asleep and at some point woke up to gunfire." (Tr. 1193.) At this interview, Det. Hayduk and his colleagues obtained a buccal swab from Creer.

{¶ 76} Det. Hayduk also met with Wicks, who came to the homicide unit and provided a statement. Wicks provided a buccal swab, and Det. Hayduk was able to eliminate him as a suspect.

{¶ 77} Det. Hayduk indicated that during his initial encounter on scene with Abercrombie, Abercrombie had given him a false name and claimed that another individual in the home had returned fire. Det. Hayduk further confirmed that all of the victims that he interviewed who were inside of the home failed to mention that Abercrombie was there, that he potentially had a gun and fired return shots, and

none of them corroborated Abercrombie's on-scene explanation that another individual was in the home returning shots.

{¶ 78} Because Abercrombie was the only witness who claimed that another individual in the home returned fire, Det. Hayduk was skeptical of this information because "[Abercrombie] was the only one that had mentioned this individual and no one else's information that we got that night was this individual mentioned or — yeah. I guess [Abercrombie] was the only one that interjected this person into this case." (Tr. 1247.)

{¶ 79} During Det. Hayduk's cross-examination, he was shown State's exhibit No. 223, the compilation video prepared by Ciula, and asked if he saw or identified the flashes in or on the windows of Cannon's home. Det. Hayduk responded that "there's all kinds of light reflecting off the windows" and stated, "I don't believe so" when asked if those could be muzzle flashes. (Tr. 1261.) He elaborated that he "did not recover any shell casings in those areas. There was no other evidence of gunfire. And, again, if you look at those videos, there's flashes of light everywhere. All over there." (Tr. 1261.) Upon a repeated showing of the video, Det. Hayduk admitted that the video showed flashes of light "inside the front door of the house" in the same area by the front door where shell casings were found. (Tr. 1261-1262.) Det. Hayduk admitted on cross-examination that in the video, when the flashes of light were allegedly coming from the house, there were seemingly no shots being fired from the suspect Kia because it was "being operated and making — starting to make a left-hand turn[.]" (Tr. 1264.)

{¶ 80} Following Det. Hayduk's testimony, the State rested. After the State rested, counsel for all of the defendants began making Crim.R. 29 motions for judgment of acquittal; all defense counsel joined on the particular Crim.R. 29 motion premised on the fact that Abercrombie did not cooperate with the investigation or prosecution of this matter until the middle of trial and the grand jury did not have the opportunity to hear his testimony prior to indictment.

{¶ 81} The jury announced its verdict on May 9, 2024. Relevant to Creer, he was found guilty of Count 1, murder. The jury acquitted Creer of all firearm specifications and remaining counts. The court found Creer guilty of the repeat violent offender specifications, attendant to Count 1.

{¶ 82} Creer was sentenced to life with parole eligibility after serving 15 years. Creer appeals his conviction, assigning five errors for our review:

> I. The trial court erred in denying Defendant's motion to dismiss Count 1.
>
> II. The trial court erred in failing to provide an instruction on independent intervening cause of death.
>
> III. Defendant's conviction was not supported by sufficient evidence.
>
> IV. Defendant's conviction was against the manifest weight of the evidence.
>
> V. The defendant was denied effective assistance of counsel.

## II. Law and Analysis

{¶ 83} We elect to discuss Creer's assignments of error out of order and together for ease of discussion and analysis.

{¶ 84} In his first assignment of error, Creer argues that the trial court erred in denying Creer's Crim.R. 29 motion for acquittal premised on the argument that Creer "was now no longer being tried on the same substantive facts presented to the grand jury."

{¶ 85} The Ohio Constitution, Article I, Section 10, provides an "inalienable protection to the defendant that he will be tried on the same essential facts on which the grand jury found probable cause." *State v. Vitale*, 96 Ohio App.3d 695, 699 (8th Dist. 1994). "'Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury.'" *Id.*, citing *State v. Headley*, 6 Ohio St.3d 475, 478-479 (1983). According to the Ohio Supreme Court, "[t]he material and essential facts constituting an offense are found by the presentment of the grand jury; and if one of the vital and material elements identifying and characterizing the crime has been omitted from the indictment such defective indictment is insufficient to charge an offense[.]" *Harris v. State*, 125 Ohio St. 257, 264 (1932).

{¶ 86} As an initial note, most of the case law that we reviewed pertaining to this assignment of error appears in situations where the prosecution has amended the indictment after the grand jury proceedings, and these later amendments were deemed to violate this constitutional right. *See, e.g.*, *id.*; *Headley*; *Vitale*. This case presents a different situation. Instead of amending the indictment, the State called

Abercrombie, a witness who, until the middle of trial, refused to cooperate with the investigation.

{¶ 87} Creer argues that Abercrombie brought in "essential" facts that "radically and fundamentally changed the very landscape of this matter." He points specifically to the facts "(1) that Abercrombie fired a gun from the interior of the Residence and (2) that Abercrombie believed that he had unintentionally shot and killed [Miller]." We find that these facts, adduced at trial from Abercrombie, did not change the "essential facts" upon which Creer was indicted.

{¶ 88} Creer was found guilty of Count 1 as charged in the indictment — felony murder, so that is the only charge we will discuss. In charging Creer with felony murder, the grand jury found probable cause to believe that Creer "cause[d] the death of Derrion Miller, as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: improperly discharging a firearm at or into a habitation, in violation of [R.C.] 2923.161(A)(1) of the State of Ohio and/or felonious assault in violation of [R.C.] 2903.11 of the State of Ohio."

{¶ 89} The only element that could potentially be affected by Abercrombie's previously unheard testimony is the proximate cause element. "In order for criminal conduct to constitute the 'proximate cause' of a result, 'the conduct must have (1) caused the result in that but for the conduct the result would not have occurred, and (2) the result must have been foreseeable." *State v. Hill*, 2018-Ohio-1401, ¶ 8 (8th Dist.), quoting *State v. Gibson*, 2013-Ohio-4372, ¶ 36 (8th Dist.). "It is not necessary

for the defendant to foresee or know the exact consequences of his conduct." *Id.* citing *Gibson* at *id.* "The consequences are foreseeable if what transpired was natural and logical of the defendant's conduct and was within the scope of the risk created by the defendant." *Id.*, quoting *Gibson* at *id.*

{¶ 90} Several Ohio courts have upheld convictions under a proximate cause theory that defendant's actions created a foreseeable risk that another party would return fire. *See, e.g., State v. Catron*, 2015-Ohio-2697 (8th Dist.) (upholding felony murder on proximate cause theory that the defendant, in drawing his weapon first, "created a foreseeable risk that his brother would return fire"); *State v. Spates*, 2015-Ohio-1014 (8th Dist.) (holding that even assuming that the victim was shot by an intervening party, it was the defendant who caused him to be in harm's way); *State v. Hoston*, 2015-Ohio-5422, ¶ 20 (8th Dist.) ("It was entirely foreseeable that Williams would be struck by an errant shot when Hoston and his cohorts engaged in a gun battle[.]").

{¶ 91} With or without Abercrombie's testimony, the essential elements necessary for the grand jury to find probable cause to charge Creer with felony murder were supported by sufficient evidence. Indeed, even if Abercrombie's testimony had been available to the grand jury, Abercrombie's recollection contains sufficient evidence upon which a grand juror could have probable cause to believe that Creer was a proximate cause of Miller's death, and the grand jury made this determination even without Abercrombie's testimony of the events.

{¶ 92} While we do not have the record of what was presented to the grand jury, there was additional evidence that is sufficient to support a theory that an individual was returning fire inside of the home and may have inadvertently shot Miller, including shell casings found inside of Cannon's home and the medical examiner's determination that a bullet recovered from Miller's body did not come from the MasterPiece Arms.

{¶ 93} As a final note, R.C. 2945.83(A) provides that "no motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of . . . [a]n inaccuracy or imperfection in the indictment, information, or warrant, provided that the charge is sufficient to fairly and reasonably inform the accused of the nature and cause of the accusation against him." Abercrombie's testimony that was previously unknown to investigators does not alter the "nature and cause of the accusation against" Creer.

{¶ 94} Based on the totality of the above discussion, we overrule Creer's first assignment of error.

{¶ 95} Related to his first assignment of error, Creer's fifth assignment of error contends that his trial counsel was ineffective for failing to move for a mistrial following Abercrombie's mid-trial appearance and testimony.

{¶ 96} To establish a claim of ineffective assistance of counsel, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668,

(1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 695. In reviewing a claim of ineffective assistance of counsel, a reviewing court must give great deference to counsel's performance. *Id*. Thus, we strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.).

{¶ 97} "Trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.), citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). Creer admits on appeal that trial counsel moved "for a brief recess so that an investigator could interview Abercrombie, he did not move for a mistrial." Creer argues that in failing to move for a mistrial, his counsel erred because "Mr. Creer's entire . . . defense would have changed. The need to retain an expert to analyze the CMHA video, for example, would have been paramount."

{¶ 98} "Decisions regarding pursuit of a mistrial are considered to be trial strategy." *State v. Vulgamore*, 2021-Ohio-3147, ¶ 35 (4th Dist.), citing *State v. Godoy*, 2019-Ohio-4625, ¶ 20 (9th Dist.). Accordingly, trial counsel acted within the scope of reasonable professional judgment in refusing to move for a mistrial, especially after the trial court gave both the State and the defense an opportunity to vet Abercrombie prior to him taking the stand.

{¶ 99} We therefore overrule Abercrombie's fifth assignment of error.

{¶ 100} In his second assignment of error, Creer takes issue with the trial court's decision not to provide a jury instruction on independent intervening cause of death, because "evidence adduced at trial strongly suggested that Abercrombie had accidentally shot and killed [Miller] after the earlier shooting had concluded, and while the Kia was leaving the scene[.]"

{¶ 101} The relevant jury instruction is found in *Ohio Jury Instructions,* CR 417.25, and reads as follows:

> INDEPENDENT INTERVENING CAUSE OF DEATH (ADDITIONAL.). If the defendant inflicted any injury not likely to produce death and if the sole and only cause of death was (natural case) (fatal injury inflicted by another person), the defendant who inflicted the original injury is not responsible for the death.

{¶ 102} An independent intervening cause absolves one of criminal liability when "the result varied from the harm[] intended." and "it must be determined that the result achieved was not so extraordinary or surprising that it would be simply unfair to hold the defendant criminally responsible for something so unforeseeable." *State v. Lovelace*, 137 Ohio App.3d 206, 215 (1st Dist. 1999).

{¶ 103} We do not find that the trial court abused its discretion in denying Creer's request for this jury instruction. To start, we note that shooting upwards of 40 bullets into an occupied home, where lights are on, people are making food, and video games are being played, is "likely to produce death." "Obviously, when 'shooting up' takes place in any home or neighborhood, death may be a natural and probable consequence of this act." *State v. Forney*, 1993 Ohio App. LEXIS 5182, at *20 (8th Dist. Oct. 28, 1993.)

{¶ 104} Again, even assuming that Abercrombie may have shot the fatal bullet that killed Miller does not change the evidence suggesting that Creer, Pettaway, and Wood began the altercation that resulted in Abercrombie retrieving his firearm and shooting back. Moreover, Det. Hayduk did not confirm that the flashes coming from inside of the home while the Kia was allegedly turning around were muzzle flashes, and the jury viewed this video as Det. Hayduk testified. Moreover, every witness on scene testified that the scene was "chaos" and that they were extremely frightened by the situation. To the extent this theory of the events was presented to the jury, it was capable of believing or disbelieving the testimony in reaching their verdict.

{¶ 105} Creer's second assignment of error is overruled.

{¶ 106} In his third assignment of error, Creer argues that his conviction for murder was not supported by sufficient evidence because Creer was convicted of felony murder, but not any predicate offense underlying the charge and, as already discussed in our analysis of his first assignment of error, he asserts that none of the charged predicate offenses were the "proximate cause" of Miller's death.

{¶ 107} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Cottingham*, 2020-Ohio-4220, ¶ 32 (8th Dist.). An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78

Ohio St.3d 380, 386 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.). Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

{¶ 108} During trial, the State presented evidence demonstrating that Creer was guilty of murder via aiding and abetting. R.C. 2923.03(A) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . aid or abet another in committing the offense." Anyone who violates this statute "shall be prosecuted and punished as if he was a principal offender." R.C. 2923.03(F).

{¶ 109} One aids or abets another "when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Seals*, 2015-Ohio-517, ¶ 34 (8th Dist.), citing *State v. Johnson*, 93 Ohio St.3d 240, 243 (2001). Aiding and abetting may be shown by both direct and circumstantial evidence and "'participation in

criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.'" *Johnson* at 245, citing *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971).

**Commented [CW1]:** Moved these paragraphs up here.

{¶ 110} We find that sufficient evidence exists upon which the jury could have concluded that Creer was guilty of felony murder. Evidence produced at trial places Creer with Wood and Pettaway in the subject vehicle both before and after the incident. This includes video footage from before and after the incident, as well as cell-phone geolocation data. Moreover, Creer posted an Instagram story on the date that Wood was arrested, where all three of the defendants are shown wearing the same clothes that they were wearing at the time of the incident and captioned it with words such as "Free Sav [Wood]," which tends to show support and companionship.

{¶ 111} Turning to the second portion of Creer's sufficiency challenge, it is settled law that a factfinder need not find a defendant charged with felony murder guilty of the underlying predicate offense. "[A] verdict that convicts a defendant of one crime and acquits him of another, when the first crime requires proof of the second, may not be disturbed merely because the two findings are irreconcilable." *State v. Gardner*, 2008-Ohio-2787, ¶ 81; *State v. Gapen*, 2004-Ohio-6548; *State v. Adams*, 53 Ohio St.2d 223 (1978). We find no reason to stray from this well-settled area of law.

{¶ 112} Accordingly, we overrule Creer's third assignment of error.

{¶ 113} Creer contends in his fourth assignment of error that his conviction was against the manifest weight of the evidence. Creer centers his argument around the legal proposition that "the mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *State v. Johnson*, 2019-Ohio-2913, ¶ 21.

{¶ 114} A manifest weight challenge questions whether the State met its burden of persuasion at trial. *State v. Hill*, 2013-Ohio-578, ¶ 32 (8th Dist.). In determining whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflict in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. When considering a claim that a conviction is against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror" and may disagree with the factfinder's resolution of the conflicting testimony. *Id.* We will reverse a conviction as against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387.

{¶ 115} As previously discussed, the State presented evidence beyond Creer's "mere presence" at the scene, as well as evidence demonstrating that Creer was not only with Pettaway and Wood prior to and after the incident, but remained with

them, and posted an Instagram story that could be inferred as demonstrating support for and companionship with "Sav." Additionally, there was no evidence that Creer abandoned his role or involvement with the crimes, or attempted to dissuade Pettaway and Wood from completing the crimes. *See, e.g., Wilborn*, 2024-Ohio-5003, ¶ 63. This is not the exceptional case where the evidence weighs heavily against the conviction.

{¶ 116} Accordingly, we overrule Creer's fourth assignment of error.

{¶ 117} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EILEEN A. GALLAGHER, A.J., and
LISA B. FORBES, J., CONCUR